ANDREW GORDON, ESQ.
Nevada Bar No. 3421
McDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1000
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
Facsimile:   (702) 873-9966
agordon@mcdonaldcarano.com

TIMOTHY J. GALLIGAN, ESQ. (*pro hac vice* to be submitted)
5 Borealis Way
Castle Rock, CO 80108
(303) 660-8787
timothyjgalligan@yahoo.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PAMELA ANNE GALLIGAN and PACIFIC PAYMENT SOLUTIONS, LLC<br><br>Plaintiffs,<br><br>vs.<br><br>MXBK GROUP SA de CV,<br><br>Defendant. | CASE NO.:<br><br>**COMPLAINT** |

Plaintiffs PAMELA ANNE GALLIGAN and PACIFIC PAYMENT SOLUTIONS, LLC, for their Complaint against defendant MXBK GROUP SA de CV allege as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a). The amount in controversy exceeds $75,000. Plaintiff Pacific Payment Solutions, LLC ("Pacific Payments") is a Utah-based Limited Liability Company. Plaintiff Pamela Anne Galligan ("Galligan") is a resident of Colorado. Defendant MXBK Group SA de CV ("MXBK") is a Mexican corporation.

2. The contract that is the subject of this lawsuit calls for disputes to be resolved in the State of Nevada. Moreover, Defendant has purposefully availed itself of the laws and benefits

of Nevada as a place to do business and otherwise, and the acts giving rise to the claims stated herein took place in substantial part in Nevada.

3. Venue is proper in the unofficial southern division of the District of Nevada because a substantial part of the actions or omissions giving rise to the claims alleged herein occurred in Clark County, Nevada.

## BACKGROUND FACTS

4. GALLIGAN is an accomplished business executive who has achieved considerable success over the past four decades. After retiring from Visa in 2002 as Head of Global Strategy, she directed her energies to the creation of new, non-legacy, modular and flexible software and a "real time, real control, real intelligence" processing engine designed to meet the most critical market needs of global prepaid payments processing. She spent years planning, researching, networking, adjusting product designs, coding and testing technology, conducting focus groups, recruiting senior industry executives and performing other preparatory work to reach the untapped worldwide prepaid card market measured in billions of prospective card holders who cannot obtain credit cards (for lack of credit history) or debit cards (for lack of a bank checking or savings account). GALLIGAN successfully de-coupled processing from decision-making, empowering the card manager or card holder to use a friendly, web-based and Graphic User Interface to customize the rules of the system or their cards, employing unprecedented virtual technology with considerably reduced front-end cost footprints. Eventually, GALLIGAN formed PACIFIC PAYMENTS and, subsequently, became the first-ever certified, virtual card processor in the world.

5. In November, 2008, Galligan and her husband met with E. Reed Hancock, a representative of MXBK in Las Vegas. Hancock was the CEO of a MXBK subsidiary, and was MXBK's appointed representative to design, establish and launch its prepaid card operations in

the Americas. Hancock had just consummated the acquisition by MXBK of a 30% equity interest in PAYCARDUSA, a prepaid card program management company based in Las Vegas. At the time of the meeting with the Galligans, Hancock was looking for software technology to process huge volumes of electronic payment transactions for and at the request of MXBK.

6. Galligan was exploring licensing opportunities with other prepaid program managers and banks just prior to her meeting with Hancock in Las Vegas.

7. During the November 2008 meeting, Hancock boasted that MXBK had "signed contracts" with CTM, the largest union organization in Mexico, to provide payroll cards to 16 million of its workers for an indefinite duration, and was late in its promised delivery of cards. Hancock represented that the cards would be issued, initially, to 2.5 million union members of the Jalisco Chapter of CTM, and immediately thereafter to almost all of the remaining 14 million CTM members throughout Mexico.

8. Beyond CTM, Hancock insisted "this is only the beginning" because MXBK also had in hand verbal commitments and "signed Letters of Intent" with several other Mexican entities totalling at least an additional 2.5 million cards to be processed by Pacific Payments as well as millions more to be processed for PAYCARDUSA. Hancock assured Galligan that Pacific Payments would be given exclusive processing rights on all cards managed by MXBK in Mexico, Central and South America, and the United States.

9. Hancock promised Galligan that Pacific Payments would be paid all of its approved and budgeted operating expenses as well as its out-of-pocket, front-end costs to start each card processing program, as well as standard monthly maintenance fees and standard annual technology update fees. In addition, Hancock offered Galligan 66 pesos (or approximately $5.00) per card per month to process transactions in Mexico, less expenses, to be split 70/30 by MXBK and Galligan, respectively. For CTM cards, she would be given the option to receive the greater

of $0.0125 per transaction processed, with a projected 12 transactions per month per card, or 30% of Pacific Payments net profit.

10. Hancock reiterated several times that MXBK had committed "$378 million" in unencumbered funds exclusively to the Pacific Payments-MXBK project, and had sufficient cash flow to pay all operating expenses of the new business venture. He provided credible documents, including various presentations to banks in Canada and Mexico (and, subsequently, the United States) showing that MXBK had more than sufficient financial strength and wherewithal to meet these obligations, including $52,824,793,091 in "assets under management" and $115,008,473 in "cash on hand."

11. During that meeting with the Galligans, Hancock offered to purchase Pacific Payments for $3.5 million, plus transaction revenues, advancements of all approved operating expenses, and net income incentives, payable to Galligan.

12. Hancock also cautioned that MXBK's previously made card processing commitments to its customers in Mexico had not been met. Because time was of the essence for it to bring these cards up and running, Hancock insisted that Galligan cease all other business engagements, drop all marketing opportunities, move from Colorado to Las Vegas immediately, and "do whatever it takes," "hit the ground running," and "hire whomever you need to get this project completed," and commence business operations immediately.

13. Galligan accepted the offer.

14. A term sheet was subsequently drafted by MXBK's attorney to memorialize the agreement reached in November 2008.

15. Subsequently, Hancock decided to forego a term sheet and proceed directly to contract, but introduced four new, never-discussed-before requirements in mid-December. During this time, without providing the $250,000 earnest money deposit or any interim operating

expense funding as agreed, Hancock directed Galligan to "do whatever it takes" to recruit and manage a full team of the highest-level professionals, purchase all needed hardware and software, and secure premises and incur other necessary expenses to meet MXBK's contracted processing obligations soonest.

16. Galligan performed as requested. Between November 2008 and January 2009, she incurred $146,000 in expenses for Pacific Payments over and above her original investment, in order to meet MXBK's urgent goals.

17. Galligan's software underwent thorough and exhaustive due diligence analyses and testing by MXBK's technology expert as well as by PAYCARDUSA's Chief Operating Officer over several weeks. Thereafter, MXBK approved the transaction to acquire these assets, Pacific Payments and the services of Galligan.

18. A formal Unit Purchase Agreement (the "Agreement") was drafted by MXBK's lawyers, and was presented to Galligan on January 20, 2009. It was signed on January 27, 2009 in Mexico.

19. In exchange for 70% of the equity shares of Pacific Payments, the technology and intellectual property of Galligan, the services of Galligan and her team, and other consideration, relevant payment terms of the Agreement included, among other things:

- $3,500,000 paid by MXBK to Galligan as follows: $2,500,000 to be paid within 10 days of contract signing, with the remaining $1,000,000 subject to two performance achievements, one of which was satisfied before contract signing and the other which was subsequently waived because of changing business requirements (Par. 2.2);

- MXBK to pay in advance all approved and budgeted operating expenses of Pacific Payments. (Par. 2.3.2); and

- At Galligan's option, Galligan was to be paid the greater of $0.0125 for each CTM prepaid card transaction processed or 30% of the net income generated by that processing business after expenses (Par. 2.3.3); and

- Galligan was to be paid 30% of the net income generated by all other (non-CTM) MXBK card processing (Par. 2.1).

20. Relevant other provisions of Agreement included:

- Exclusive rights given to Pacific Payments to process all present and future MXBK and affiliate cards, provided performance is at reasonable market standards (Par. 2.3.1);

- 30 days to correct a material breach after notification (Par. 2.3.6);

- Affirmative confirmation by MXBK that it had the "power, legal capacity and authority" to perform its obligations (Par. 4.2);

- MXBK confirmed it had not made any "untrue statement of a material fact," omitted a material fact, or included any "misleading" fact in the Agreement (Par. 4.4);

- MXBK confirmed that it had sufficient knowledge and experience to evaluate Pacific Payments and had performed all necessary due diligence (Par. 4.5); and

- MXBK agreed to indemnify Galligan for all losses (including filed lawsuits) resulting from its errors/omissions (Par. 6.3).

21. On February 2, 2009, a week after the Agreement was executed by all parties, MXBK informed Galligan that completion of a Payment Card Industry Data Security Standards audit was a prerequisite to the payment for the equity purchase funds. This audit was already in

6

process by a third party certifier, but had never been identified as an issue in any previous discussions or in the Agreement. Notwithstanding the belated demand, Galligan completed the PCI/DSS Audit, and Hancock signed off on this requirement on February 21, 2009.

22. Despite repeated written and verbal assurances from Defendant that the $3.5 million payment was forthcoming imminently, on February 9, 2009, Galligan received an e-mail from MXBK's broker/dealer in Amsterdam stating that "all MEXBANK funds are in trades within our CITIBANK program" and, therefore, "not available for transfer."

23. Timothy J. Galligan wrote to MXBK's attorney and Hancock that same day to formally inform them that MXBK was in material breach of the Agreement because of its non-payment, and that Galligan would not waive the breach.

24. Subsequently, Hancock repeatedly reassured Galligan that payment would be forthcoming "soon."

25. On February 25, 2009, in face-to-face meetings in Las Vegas, MXBK CEO Trejo, MXBK General Counsel Juan Carlos Harris, and MXBK's broker/dealer Michael Ramsingh reconfirmed to Galligan that the money was to be paid "within a few days."

26. Neither the agreed equity payment nor operating funds for February arrived from MXBK as promised.

27. On March 5, 2009, MXBK finally wired $194,721 to cover the budgeted expenses of Pacific Payments for February. Although tardy by over one month, Hancock stated that this payment, when combined with numerous reassurances from several of its representatives, was proof of MXBK's firm commitment to the project and intention to fully satisfy all obligations under the Agreement.

28. Although Galligan had provided MXBK the appropriate bank account wire information for Pacific Payments, the money was actually deposited into an account belonging to

Hancock. Within four days, Galligan discovered these funds had been exhausted. Subsequent investigations revealed that approximately $50,000 intended for Pacific Payments had been diverted to cover MXBK expenses unrelated to Pacific Payments.

29. By March 24, 2009, only $60,000 of the $199,409 approved by Hancock for March operating expenses had been received by Pacific Payments. On March 26, 2009, Galligan wrote to Hancock requesting payment of the equity money, operating expenses, and compensation for the lateness of payment. Hancock replied that he agreed that those payments plus additional compensation were appropriate.

30. On April 1, 2009, Hancock deposited another $70,000 (still not meeting the amount approved for March expenses) in a newly-created Pacific Payments corporate account. Once again, those funds were diverted without Galligan's knowledge or consent to pay MXBK expenses unrelated to Pacific Payments.

31. Throughout March and April, 2009, Hancock and other representatives of MXBK repeatedly promised that the equity payment would be made imminently, that all operating expenses in arrears would be brought current, and that Galligan needed to intensify her development efforts to process even more MXBK cards under contract in Mexico and the United States than the almost 20 million originally anticipated because of MXBK's stepped-up, accelerating and very successful marketing and sales efforts.

32. In mid-April 2009, Hancock told Galligan that regulators in Amsterdam and Switzerland were investigating MXBK transactions because of fraudulent actions perpetrated by a few of their customers, although he insisted that the unencumbered $378 million committed to the project was unaffected.

33. Galligan had been incurring expenses based on the terms of the Agreement and MXBK's repeated insistence that Pacific Payments ramp up as quickly as possible to meet

8

MXBK's delinquent and increasing customer card processing obligations. Obviously, Galligan would have refrained from incurring such expenses and making operating, hiring and contractual commitments had she known payment would not be made by MXBK. In late April, 2009, Galligan demanded reimbursement for those expenses. Hancock again promised that an additional $250,000 was "on its way" from MXBK, and that "another $800,000 was to be provided for operating expenses by May 19, 2009."

34.  Hancock deposited another $80,000 in the Pacific Payments account on April 29, 2009. However, once again, those funds were diverted to others and were exhausted before Galligan could pay the outstanding obligations of Pacific Payments.

35.  On April 30, 2009, after an audit of the books in Las Vegas, MXBK's accountant acknowledged in writing that MXBK had not met its contractual commitments to Pacific Payments.

36.  Around the same time, an extensive forensic audit of the books of PAYCARDUSA, MEXGROUP CARD SERVICES US and/or MEXGROUP USA and Pacific Payments revealed that only approximately $325,000 had been received by Pacific Payments, considerably less than the approved budgets of approximately $1 million at that point.

37.  During the first two weeks in May, Hancock and other MXBK representatives continued to reassure Galligan that long-overdue funds would be forthcoming, and requested her continued support and patience. With payables increasing, Galligan pleaded for payment and Hancock assured her that overdue funds were forthcoming from MXBK. Hancock promised twice to deposit $100,000 in the bank account of Pacific Payments by May 15, 2009.

38.  On May 14, 2009, MXBK representative Jesus Guajardo came to Las Vegas, met with Galligan and, for the first time, informed her that almost all of MXBK's liquid assets were

frozen by the regulators and courts in Europe, no funds were available for Pacific Payments at that time and none would be available at any time in the foreseeable future.

39. Guajardo acknowledged during the meeting that MXBK owed not only the overdue operating expenses and the $3.5 million in unpaid equity money, but significant additional penalty compensation as well.

40. At that same meeting in Las Vegas, Guajardo offered to pay Pacific Payments $600,000 for operating expenses for the next twelve months (in contrast to Hancock's previously approved budgeted expenses of approximately $250-300,000 per month) to keep Pacific Payments in "survival mode."

41. Defendant did not deposit the promised $100,000 by May 15, 2009, as promised. Guajardo did not pay the $600,000 survival mode money as promised.

42. Apparently, MXBK's financial problems in Europe predated the signing of the Agreement. Thus, when MXBK signed the Agreement attesting to the fact that it had the power and capacity to perform its obligations, in fact it did not. MXBK also attested to the fact that the Agreement contained no untrue or misleading statement of material fact or omitted any material fact, which now appears untrue.

43. MXBK did not disclose significant and relevant aspects of its judicial problems in Switzerland and regulatory problems in Amsterdam and London until late April (Hancock revelation), the liquidity implications of those problems until May 14, 2009 (Guarjardo disclosure) and the full consequences of those problems until late June, 2009 (see MXBK Board decision below).

44. All along, MXBK promised to pay not only the payment to Galligan for her shares as well as budgeted and approved operating expenses of Pacific Payments, but, also certain salary and business expenses of MXBK employee Thomas Cleveland (former CFO of Visa worldwide

recruited by Galligan). MXBK had signed an employment agreement with Cleveland guaranteeing him 90 days of severance. No payment in any amount from MXBK was forthcoming, causing Galligan to pay Cleveland's salary and expenses from her personal funds.

45. Faced with no money coming up from MXBK, Galligan was forced to terminate the employment of all Pacific Payments employees and suspend Pacific Payments' operations.

46. On June 30, 2009, MXBK's legal counsel informed Galligan via email that the MXBK Board had decided to "step out from the prepaid card business" and to abandon its obligations to Pacific Payments.

47. Galligan recently learned that Hancock and Guajardo are in the process of forming a new company with other MXBK representatives to reap the benefits of the MXBK processing contracts for prepaid cards (promised to Plaintiffs per the Agreement). Such actions violate the Agreement, which gives Plaintiffs the first right of refusal for any business with customers of MXBK or affiliated companies.

48. Plaintiffs have been forced to retain the services of lawyers to enforce their rights. Pursuant to law and the Agreement, Plaintiffs are entitled to recover their costs and fees incurred in connection with this matter.

**FIRST CAUSE OF ACTION**
**(Intentional Misrepresentation or Omission)**

49. Plaintiffs reallege and incorporate by this reference the allegations contained in Paragraphs 1 through 48 above, as if fully set forth herein.

50. Defendant intentionally made material false and misleading representations to Plaintiffs, including but not limited to those set forth above.

51. Upon information and belief, Defendant knew the material misrepresentations and omissions were false and/or misleading at the time the statements were made, and it made them for the purpose and with the intent that Plaintiffs rely thereon.

52. Plaintiffs did not know the representations were false and believed them to be true. Plaintiffs were not aware of the facts and information that were fraudulently concealed, and detrimentally relied on the statements and omissions of Defendant.

53. As a direct and proximate result of Defendant's intentional omissions and misrepresentations, Plaintiffs have been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation or Omission)

54. Plaintiffs reallege and incorporate by this reference the allegations contained in Paragraphs 1 through 53 above, as if fully set forth herein.

55. Defendant negligently made material false and misleading representations to Plaintiffs, including but not limited to those set forth above.

56. Upon information and belief, Defendant was negligent in making those misrepresentations and omissions, in that it should have known they were false and/or misleading at the time the statements were made. Defendant made them for the purpose and with the intent that Plaintiffs rely thereon.

57. Plaintiffs did not know the representations were false and believed them to be true. Plaintiffs were not aware of the facts and information that were concealed, and detrimentally relied on the statements and omissions of Defendant.

58. As a direct and proximate result of Defendant's negligent omissions and misrepresentations, Plaintiffs have been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.

### THIRD CAUSE OF ACTION
### (Breach of Contract)

59. Plaintiffs reallege and incorporate by this reference the allegations contained in Paragraphs 1 through 58 above, as if fully set forth herein.

60. Defendant breached the terms of the written Agreement it entered into with Plaintiffs by, among other things, the acts and omissions set forth above.

61. Plaintiffs have fully performed or offered to perform all of their obligations under the Agreement, except such obligations as were prevented by Defendant's conduct or such obligations as were excused, waived or modified.

62. As a direct and proximate result of Defendant's breach of the Agreement, Plaintiffs have suffered, and will continue to suffer, damages in excess of $75,000, the exact amount of which will be proven at trial.

63. Galligan is entitled to specific performance of the Agreement and/or recovery of her damages.

### FOURTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

64. Plaintiffs reallege and incorporate by this reference the allegations contained in Paragraphs 1 through 63 above, as if fully set forth herein.

65. Nevada law implies into every contract an implied covenant of good faith and fair dealing.

66. Defendant breached the implied covenant of good faith and fair dealing that is implied into the written Agreement it entered into with Plaintiffs by, among other things, the acts, omissions and misrepresentations set forth above.

67. As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered, and will continue to suffer, damages in excess of $75,000, the exact amount of which will be proven at trial.

## FIFTH CAUSE OF ACTION
### (Accounting)

68. Plaintiffs reallege and incorporate by this reference the allegations contained in Paragraphs 1 through 67 above, as if fully set forth herein.

69. By reason of the foregoing, and by virtue of her status as described above, Galligan is entitled to a full and complete accounting with respect to the books, records, finances and operations of MXBK as related to its business operations described herein, including all transactions and relationships with its principals, directors, managers, regulators and customers.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

70. Plaintiffs reallege and incorporate by this reference the allegations contained in Paragraphs 1 through 58 above, as if fully set forth herein.

71. As an alternative claim for relief, should the court find that there is no enforceable contract between Plaintiffs and Defendant, then Plaintiffs are entitled to be reimbursed for all of their time and expenses and obligations incurred in furtherance of the business relationship described above. Plaintiffs spent considerable time and incurred hundreds of thousands of dollars in expenses setting up business operations to process the transactions promised by Defendant. Plaintiffs also passed on other potential business ventures. Defendant received significant benefits from Plaintiffs' efforts. If Defendant is allowed to retain those benefits without paying Plaintiffs for their efforts, then Defendant will be unjustly enriched at Plaintiffs' expense.

72. Based on the foregoing, Plaintiffs are entitled to be paid for their time and efforts and obligations, and are entitled to be reimbursed for the expenses they incurred or will incur, according to proof at trial but in any event in excess of $75,000.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter Judgment in their favor and against Defendant as follows:

a. For compensatory damages in an amount according to proof presented at trial;

b. For specific performance of the Agreement;

c. For the imposition of a constructive trust over and upon Defendant's assets to secure payment of the amounts owed to Plaintiffs;

d. For an accounting, including an Order that Defendant and all affiliated entities and individuals make all books and records available for inspection and copying;

e. For reasonable attorneys' fees, costs of suit, expert fees, and;

f. For such other and further relief as this Court deems proper.

RESPECTFULLY SUBMITTED this 2nd day of October, 2009.

McDONALD CARANO WILSON LLP

By: _____
Andrew Gordon, Esq. (#3421)
2300 West Sahara Avenue, Suite 1000
Las Vegas, Nevada 89102
*Attorneys for Plaintiffs*

::ODMA\PCDOCS\LVDOCS\176968\2